448 F.2d 1095
 145 U.S.App.D.C. 172
 The ASSOCIATED PRESS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., American Telephone and
Telegraph Co., Intervenors.
AEROSPACE INDUSTRIES ASSOCIATION OF AMERICA, Inc., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., American Telephone and
Telegraph Co., Intervenors.
AIR TRANSPORT ASSOCIATION OF AMERICA et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., Bethlehem Steel
Corporation, et al., American Telephone and
Telegraph Co., Intervenors.
AMERICAN TRUCKING ASSOCIATIONS, Inc., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., American Telephone and
Telegraph Co., Intervenors.
AERONAUTICAL RADIO, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., American Telephone and
Telegraph Co., Intervenors.
NATIONAL ASSOCIATION OF MOTOR BUS OWNERS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
The Western Union Telegraph Co., American Telephone and
Telegraph Co., Intervenors.
United States Court of Appeals,
District of Columbia Circuit.
 No. 23833, 23836, 23839, 23841 to 23843
 Argued Oct. 23, 1970.
Decided July 12, 1971.
As Amended July 15, 1971.
 
 Mr. Donald C. Beelar, Washington, D. C., with whom Mr. John L. Bartlett, Washington, D. C., was on the brief, for petitioner in No. 23,833.
 Mr. Arthur Scheiner, Washington, D. C., with whom Mr. Richard A. Solomon, Washington, D. C., was on the brief, for petitioner in No. 23,836.
 Mr. William E. Miller, Washington, D. C., with whom Messrs. James E. Landry, Herbert E. Forrest, Charles R. Cutler, John L. Bartlett, Charles F. McErlean, Jr., Chicago, Ill., Calvin Davison and Stephen L. Babcock, Washington, D. C., were on the brief, for petitioners in Nos. 23,839 and 23,842. Mr. James F. Reilly, Washington, D. C., also entered an appearance for petitioners in No. 23,839 and 23,842.
 Mr. Edward J. Kuhlmann, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel at the time the brief was filed, John H. Conlin, Associate General Counsel, and Katrina Renouf, Counsel, Federal Communications Commission, were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondent, Federal Communications Commission. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for respondent, United States of America.
 Mr. Melvin Richter, Washington, D. C., with whom Mr. Jack Werner, Washington, D. C., was on the brief, for intervenor The Western Union Telegraph Company. Mr. Harold L. Talisman and Mr. Sidney Goldman, Washington, D. C., also entered an appearance for intervenor, The Western Union Telegraph Company.
 Mr. Hugh B. Cox, Washington, D. C., with whom Messrs. E. Edward Bruce, Washington, D. C., Harold J. Cohen and Alfred A. Green, New York City, were on the brief, for intervenor, American Telephone and Telegraph Company.
 Mr. Richard P. Taylor, Washington, D. C., was on the brief for petitioner in No. 23,843.
 Messrs. Jeremiah Courtney and Arthur Blooston, Washington, D. C., entered appearances for petitioner in No. 23,841 and intervenors, Bethlehem Steel Corporation, et al. in No. 23,839.
 Before ROBINSON, MacKINNON and ROBB, Circuit Judges.
 ROBB, Circuit Judge:
 
 
 1
 The petitioners challenge two orders[1] of the Federal Communications Commission, designating for hearing and investigation a revised tariff submitted by the American Telephone and Telegraph Company (AT&T) on October 1, 1969. The tariff, filed pursuant to Sec. 203 of the Communications Act of 1934,[2] proposed increased rates for a private line service known as TELPAK. The petitioners are users of the TELPAK service. AT&T and The Western Union Telegraph Company, a competitor of AT&T, have intervened in support of the orders.
 
 
 2
 By the two orders the Commission, pursuant to Sec. 204 of the Act,[3] (1) ordered an investigation and hearing as to the lawfulness of the proposed tariff; (2) suspended the effective date of the tariff for three months and (3) provided that AT&T must keep accurate account of all amounts received by reason of the increased rates pending completion of the hearing. Attacking the orders on several grounds the petitioners contend that the Commission was required to reject the proposed tariff. We think the orders must be sustained.
 
 
 3
 The challenged tariff proposed increased rates for TELPAK C and D. TELPAK is a private line service offered to large-volume users such as the petitioners in this case. When first offered by AT&T in 1961, TELPAK consisted of four distinct categories of service: TELPAK A, B, C, and D, respectively offering 12, 24, 60 and 240 equivalent voice circuits. A Commission investigation of the rates resulted in a decision in 1964 holding (1) that the TELPAK A and B rates were discriminatory and not justified by competitive necessity and (2) that the TELPAK C and D rates were apparently justified by competitive necessity but that a further investigation should be made to determine whether these rates were compensatory. 38 F. C.C. 370 (1964); 37 F.C.C. 1111 (1964); 38 F.C.C. 761 (1965). On review this court sustained the Commission's decision. American Trucking Associations, Inc. v. FCC, 126 U.S.App.D.C. 236, 377 F.2d 121 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967).
 
 
 4
 After this court decided the American Trucking Associations case the Commission in 1966 incorporated the issue whether the existing TELPAK C and D rates were lawful into the AT&T General Rate Investigation, Docket No. 16258. 7 F.C.C.2d 30; A. 7. The Commission pointed out that the purpose of that investigation was "among other things, to deal with variations in the level of earnings of different classes of service and not with individual rate components within rate classifications." 7 F.C.C.2d at 31; A. 8. However, the Commission ordered AT&T to submit additional cost data as to TELPAK C and D; and the Commission recognized that such data "may be accompanied by proposed changes in those rates". Continuing, the Commission said "We do not wish such specific rate issues to become part of the more general issues of Docket No. 16258. Accordingly, when such tariff filings are made, if need therefore arises, it is expected that those issues will be examined in a separate docket." 7 F.C.C.2d at 31; A. 8.
 
 
 5
 On January 9, 1967 AT&T submitted to the Commission and distributed to all parties in Docket No. 16258 cost data and new rate proposals for TELPAK C and D. The proposed rates were at the levels now challenged by the petitioners. In submitting these rates AT&T stated:
 
 
 6
 we propose that these rate changes for TELPAK C and D should not become effective until the latter part of 1967. It is expected that additional supporting detail will be furnished at the time revised tariff schedules are filed.
 
 
 7
 ******
 
 
 8
 * * *
 
 
 9
 Respondents [AT&T and the Associated Bell System Companies] recognize, of course, the difficulties that present TELPAK customers will encounter in evaluating their communications requirements and in restructuring their communications networks, in light of the rate increases proposed in this statement and of the elimination of TELPAK A and B. These customers should be afforded adequate time to make the necessary rearrangements. A. 22, 24-25.
 
 
 10
 Thirteen months later, on February 1, 1968, AT&T filed tariff revisions embodying the rates proposed on January 9, 1967. These rates were to become effective April 1, 1968, but on March 13, 1968 AT&T asked special permission from the Commission to withdraw the proposed revisions. Explaining its request AT&T stated:
 
 
 11
 It is our view that the TELPAK rate levels embodied in our tariff revisions filed on February 1, 1968 are fully justified by the relevant cost and market considerations referred to in our Transmittal No. 10001. Nevertheless, we recognize that the impact on our customers of these proposed changes is, in many cases, very substantial, and that in some cases customers have indicated that required rearrangements cannot be made by April 1.In the circumstances we propose to withdraw the tariff revisions now scheduled to become effective April 1, 1968 and to file a new set of revisions which will provide for a lesser increase in the level of TELPAK rates. We believe that in any Commission investigation it will be demonstrated that TELPAK rates should be established at substantially the level of those which were filed to become effective April 1, 1968. The proposed new revisions will constitute an intermediate step in achieving that level. AT&T Application No. 643; A. 134.
 
 
 12
 On March 14, 1968 the Commission granted AT&T's request. Special Permission No. 5258.
 
 
 13
 On March 25, 1968 AT&T withdrew the TELPAK tariff proposed on February 1, 1968 and filed "interim" rates to become effective June 1, 1968. The "interim" rates were lower than those proposed on February 1, 1968 and withdrawn, but higher than the rates then existing. On April 10, 1968 the Commission, pursuant to 47 U.S.C. Sec. 204, suspended the proposed "interim" rates for three months, making them effective September 1, 1968. A. 170 (noted, 12 F.C.C.2d 1028). At the same time the Commission instituted an investigation, Docket No. 18128, into the lawfulness of the rates. The Commission stated:
 
 
 14
 We are suspending the proposed tariff schedules to the full extent of our statutory authority on the basis of the considerations recited above. This means that the schedules will become effective September 1, 1968. Moreover, it should clearly be understood by the TELPAK users, that, in the event a complete hearing record indicates that increases in the level of TELPAK rates are justified or required, or that the TELPAK classification should be eliminated, any increases occasioned thereby will become effective without delay. The users should henceforth govern themselves accordingly, and their communications budgets should be prepared with this contingency in mind. In this connection, users have been on notice since 1961 that TELPAK rates presented substantial questions of lawfulness requiring formal investigation and that significant increases in these rates could result. A. 172.
 
 
 15
 In a Memorandum Opinion and Order adopted July 10, 1968, 13 F.C.C.2d 853; A. 176, the Commission deferred the hearing on the rate increases in Docket No. 18128. The Commission explained that proper consideration of the TELPAK rates depended upon the result of two proceedings already being conducted. In the first of these proceedings, known as phase 1-B of Docket No. 16258, the Commission was considering whether competitive or other valid considerations justified the pricing discrimination existing in the TELPAK offering; and, if so, whether AT&T's existing or proposed rates for TELPAK would make an appropriate contribution to AT&T's total interstate revenue requirements. Resolution of these questions was, in the Commission's opinion, "of threshold essentiality to a determination [in Docket No. 18128] of the reasonableness and lawfulness of the specific rates and rate relationships with the individual rate structures." 13 F.C.C.2d 853, 856; A. 176, 180.
 
 
 16
 The other proceeding referred to by the Commission, Docket No. 17457, involved the provision in the TELPAK tariff which permits certain classes of private line customers to share the use of lines in order to take advantage of the TELPAK offering. The Commission explained that resolution of the issues presented in this proceeding with respect to TELPAK sharing "may have an effect upon the market for TELPAK services on the basis of which Respondents [AT&T and the Associated Bell System Companies] have calculated their costs of furnishing such services, which costs have been presented by Respondents in Docket No. 16258 in purported justification of their proposed revised TELPAK rates. This, in turn, could have a substantial impact on the overall level and revenue yield of TELPAK rates as well as the propriety of the internal rate components of the TELPAK schedule. * * * We will, therefore, defer hearings in docket No. 18128 concerning the internal specifics of the TELPAK rate structure until the rate principles determinations are made in docket No. 16258 and the sharing issue is decided in docket No. 17457." 13 F.C.C.2d at 856, 857; A. 181.
 
 
 17
 Although some of the petitioners urged that the specific questions raised by the intermediate rise in the TELPAK rates should be considered in the general investigation of AT&T rates, Docket No. 16258, the Commission concluded that such a consolidation would defeat the objectives of the general proceeding by encumbering it with "the separable and time-consuming task of examining and passing upon the propriety of the internal design or detailed components of the rate structure of a particular class of service." 13 F.C.C.2d at 855; A. 180.
 
 
 18
 On May 28, 1969 the parties in phase 1-B of Docket No. 16258 and the staff of the Commission's Common Carrier Bureau submitted to the Commission a "Statement of Rate-Making Principles and Factors" (Statement). 18 F.C.C.2d 761; A. 214. The Statement set out rate-making principles upon which the parties and staff had agreed and the procedures which the parties recommended to the Commission for implementing these principles. It recognized that "while respondents [AT&T and the Bell companies] have previously submitted in this record detailed studies and have proposed or effectuated rate adjustments, they propose to make new studies in conformity with the principles agreed to herein, and thereafter to file such further specific rate adjustments as may be consistent therewith. Accordingly, respondents will proceed expeditiously to make such new studies." 18 F.C.C.2d at 768; A. 224. The Statement provided that "No carrier initiated rate level increases will be filed until the new cost studies * * * have been completed and made available to the parties hereto. The effective date of any such rate level increase will be subject to such authority as the Commission may possess." 18 F.C.C.2d at 768; A. 224.
 
 
 19
 In a Memorandum Opinion and Order adopted July 29, 1969 the Commission reviewed the Statement "solely for the purpose of determining whether the implementation of the suggested procedures might facilitate the determination of appropriate rate-making principles * * *." 18 F.C.C.2d at 762; A. 215. Noting that the Statement contemplated that "effective testing of the complex economic theories of costing and pricing which have been advanced * * * can best be accomplished by relating the principles advocated to specific rate proposals" (18 F.C.C.2d at 763; A. 216-217) the Commission concluded that this result might be achieved in Docket No. 18128. Accordingly, the Commission incorporated into Docket No. 18128 the 102 volumes of testimony and related exhibits comprising the record of phase 1-B of Docket No. 16258.
 
 
 20
 On October 1, 1969 AT&T filed with the Commission a tariff revision containing increased rates for TELPAK to become effective November 1, 1969. AT&T Transmittal No. 10609; A. 272. The new rates were the same that had been originally proposed in January 1967, embodied in the tariff filed in February 1968, and withdrawn in March 1968. These new and increased rates are the ones challenged by the petitioners in this court.
 
 
 21
 In justification of the increases AT&T relied upon studies and analyses recently completed pursuant to the Statement of Rate-Making Principles and Factors. The increases were attacked by the petitioners and others upon the grounds that (1) they violated the Statement of Rate-Making Principles and Factors, (2) they were patently improper and unlawful because in certain respects they failed to comply with Sec. 204 of the Communications Act and the Commission's rules, and (3) suspension and investigation of these tariffs, together with an accounting order, were inadequate remedies. A. 355-488, 496506, 543-557. The petitioners argued that they were entitled to extraordinary relief, by way of rejection or compulsory withdrawal of the proposed tariff, or the postponement or rescheduling of its effective date.
 
 
 22
 Responding to the attacks on the tariff revision of October 1, 1969, the Commission on October 29, 1969 suspended the proposed rates for the full three-month statutory period and instituted an investigation into the lawfulness of the rates. 20 F.C.C.2d 383; A. 558. The Commission directed that the investigation be made in Docket No. 18128. In addition the Commission provided for accounting procedures so that if the investigation should result in a determination that any of the increased rates was unlawful, refunds could be ordered for charges collected in excess of the lawful rate. The Commission's action was unanimous, except that Commissioners Cox and Johnson voted to suspend the new TELPAK rates for only one day, instead of the three months prescribed by the majority.
 
 
 23
 The Commission took note of the argument that the proposed rate increase violated the Statement of Rate-Making Principles and Factors. It held that it could not "agree with the petitioners' construction of the Statement". 20 F.C.C.2d at 385; A. 561. It observed that the Statement "per se does not establish substantive rights and obligations which, if not observed, can be viewed as a breach of contract." 20 F.C.C.2d at 386; A. 561. It said, however, that it would be "concerned" if any of the parties departed substantially from the import of the Statement, and added that any such alleged departures could be raised in the hearings in Docket No. 18128. 20 F.C. C.2d at 386; A. 561.
 
 
 24
 With respect to the requests of TELPAK users for extraordinary relief, the Commission reiterated its earlier holding that it had no power to grant such relief pursuant to sections 4(i) and 303(r) of the Act, as amended, 47 U.S.C. Secs. 154(i), 303(r) (1964), and declined to decide whether it had such power under Sec. 203(b), 47 U.S.C. Sec. 203(b) (1964); 20 F.C.C.2d at 386; A. 561-562. The Commission also held that, quite apart from the question of its authority to grant extraordinary relief, it would deny such relief because of the failure of the petitioners and others to present "sufficient circumstances that would require the extraordinary remedies they seek * * *." 20 F.C.C.2d at 386; A. 562. The Commission referred to its prior deferral of proceedings in Docket No. 18128 pending findings and determinations in phase 1-B of Docket No. 16258 and in the TELPAK Sharing Case (Docket No. 17457), and on the basis of intervening events in those proceedings directed that hearings in Docket No. 18128 go forward.[4] 20 F.C.C.2d at 387-388; A. 563-564.
 
 
 25
 Some of the petitioners and other parties before the Commission filed petitions for reconsideration of the Commission's Order of October 29, 1969. A. 594-619, 646-665. These petitions renewed and amplified arguments previously made to the Commission. In addition, some of the petitions alleged that a press release issued by the Commission on November 5, 1969 demonstrated that it had prejudged the lawfulness of the proposed TELPAK rate increases.
 
 
 26
 In the press release of November 5, 1969 the Commission announced that in connection with the comprehensive review of AT&T's interstate operations and earnings requirements, recently completed as part of the Commission's continuing surveillance of the company's operations,
 
 
 27
 Reductions in rates for interstate long distance telephone calls will be submitted shortly by the Bell System telephone companies to the Federal Communications Commission. It is expected that the reduced rates will save users of telephone service about $150 million per year. In addition, AT&T has previously agreed to file reductions of about $87 million representing an offset to increases in revenues resulting from higher rates recently filed for program transmission, Telpak and teletypewriter exchange (TWX) services when the latter increases become effective. The Commission anticipates that the new rates will permit the companies to achieve earnings in a range needed to attract capital under today's conditions. A. 572.
 
 
 28
 The petitioners argued that since the Commission noted in its press release that AT&T had agreed to reduce interstate long distance rates, to offset increases in TELPAK and other private line rates, it followed that the Commission had determined that the TELPAK rates were lawful.
 
 
 29
 In a Memorandum Opinion and Order adopted January 16, 1970 the Commission rejected the contention that it had prejudged the lawfulness of the TELPAK rate increases. 21 F.C.C.2d 1; A. 724. The Commission explained that the surveillance proceedings had not resulted in the TELPAK rates submitted by AT&T. Those rates, said the Commission, "must meet the statutory requirements", and "AT&T has no resort to any arguments that such rates were part of an offset arrangement." 21 F.C. C.2d at 3; A. 726-727. "The Commission has made no decision as to the lawfulness of the Telpak tariff offering or the specific rates provided for therein. * * * [T]he Telpak users have not been caught by surprise in a situation where unexpected rate increases were proposed by the carrier. Therefore, in this situation we believe the rights of the Telpak users will be sufficiently protected by the accounting order that was entered, and will deny the motion for stay."[5] 21 F.C.C.2d at 4; A. 728.
 
 
 30
 The gist of the petitioners' argument in this court is that the Commission was required by law to reject the challenged increase in TELPAK rates, and its refusal to reject was an abuse of discretion. The argument is founded upon the following contentions, advanced by one or more of the petitioners:
 
 
 31
 (1) The increase violates the Communications Act and the Commission's tariff regulations, and the Commission abused its discretion in failing to reject it, because
 
 
 32
 (a) AT&T failed to make a sufficient showing in justification of the change in rates, as required by the Commission's rules;
 
 
 33
 (b) Acceptance of the rates by the Commission, and the deferral of the proceedings relating to the interim rates, permit AT&T to "pyramid" TELPAK rate increases and to earn more than the rate of return previously authorized by the Commission; and
 
 
 34
 (c) The rate increases violated the terms of the Statement of Rate-Making Principles and Factors.
 
 
 35
 (2) By coupling reductions in interstate long-distance rates with increases in TELPAK rates the Commission prejudged the TELPAK case.
 
 
 36
 We start with the premise that we have no authority to order an additional suspension when, as in this case, the Commission has suspended a tariff for the maximum period allowed by statute. Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). Nor may we review a refusal to suspend. National Industrial Traffic League v. United States, 287 F.Supp. 129 (D.D.C.1968), aff'd per curiam, 393 U.S. 535, 89 S.Ct. 873, 21 L. Ed.2d 754 (1969); Movers' & Warehousemen's Ass'n of America v. United States, 227 F.Supp. 249 (D.D.C.1964); Luckenbach Steamship Co. v. United States, 179 F.Supp. 605, 610 (D.Del. 1959), vacated and dismissed as moot, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960); Bison Steamship Corp. v. United States, 182 F.Supp. 63, 66 (N.D. Ohio 1960). The petitioners insist, however, that this "is a tariff rejection case. It is not a tariff suspension case."[6] "Petitioners do not address themselves to a power to suspend, the subject of the Arrow Transportation case, but to a responsibility to reject. Petitioners do not claim merely that the rate increases were unreasonably high or discriminatory, or that the error was the failure of the Commission to suspend beyond the statutory period, but instead that this Court can and should void the Commission's arbitrary and capricious order because the Commission in effect has abdicated its authority and duty to reject altogether the further TELPAK rate increases here involved."[7]
 
 
 37
 The distinction drawn by the petitioners may be semantic rather than substantial, since it appears that what they demand is not a final rejection of the rate increase but merely deferral of its effectiveness until the lawfulness of the rates has been determined in a hearing.[8] We recognize, however, that an agency has the power and in some cases the duty to reject a tariff that is demonstrably unlawful on its face. Thus, an agency will reject a tariff that conflicts with a statute, agency regulation or order, or with a rate fixed in a contract sanctioned by statute; similarly, a tariff will be rejected if it is unlawful without prior agency approval, and approval has not been obtained. In such cases the refusal of an agency to reject a tariff may be reviewed by the courts.[9] We therefore examine the petitioners' contentions in the light of the record, to determine whether the petitioners have demonstrated that the Commission was bound to reject the proposed rates as unlawful.
 
 
 38
 Sec. 61.33(a) of the Commission's Regulations, 47 C.F.R. Sec. 61.33(a) (1970), provides that a tariff filing must be accompanied by a letter of transmittal that includes "a statement showing in detail the reasons for all changes in charges or regulations and in case any such change results in increased charges, the facts upon which the carrier relies in justification thereof." Sec. 204 of the Communications Act, 47 U.S.C. Sec. 204 (1964), provides in part that "At any hearing involving a charge increased, or sought to be increased, * * * the burden of proof to show that the increased charge, or proposed increased charge, is just and reasonable shall be upon the carrier * * *." Combining the statute with the regulation the petitioners reach the conclusion that the regulation requires a carrier when filing increased rates to make a prima facie case that they are justified. From this premise the petitioners argue that the Commission abused its discretion and erred as a matter of law in refusing to reject the TELPAK tariff because the data filed by AT&T did not show that the tariff was prima facie justified. Specifically, the petitioners argue that AT&T did not file materials that provided a "prima facie justification" for the change in telegraph/telephone equivalency from 6:1 to 2:1. Brief for The Associated Press at 17; Brief for the Airline Industry Petitioners at 37.
 
 
 39
 We think the petitioners' argument is answered by American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). In that case the Supreme Court held that rules of the Interstate Commerce Commission similar to Sec. 61.33 (a) of the FCC regulations were "mere aids to the exercise of the agency's independent discretion" (397 U.S. at 539, 90 S.Ct. at 1293) promulgated for the purpose of providing the necessary information for the Commission to reach an informed decision on applications. 397 U. S. at 538, 90 S.Ct. 1288. The rules were not, said the Court, "intended primarily to confer important procedural benefits upon individuals". 397 U.S. at 538, 90 S.Ct. at 1292. So here the purpose of the Commission's rule is to provide the Commission with the information necessary to decide whether an investigation and suspension of proposed rates should be ordered; and this information may be sufficient even though it does not amount to a prima facie case. In the exercise of its discretion the Commission determined that sufficient information had been submitted by AT&T. In the absence of any "showing of substantial prejudice to the complaining party" (see American Farm Lines v. Black Ball Freight Service, supra at 539, 90 S.Ct. at 1292), we will not review the judgment of the Commission.
 
 
 40
 We turn now to the argument, as summarized in the Brief for the Airline Industry Petitioners at 31-32, that "when AT&T has proposed to raise TELPAK rates while issues on the propriety of lower rates were undetermined, and it was already earning in excess of its authorized rate of return, * * * it was arbitrary and capricious for the Commission not to reject the further rate increases until some decision had been made on the underlying unresolved issues." As part of the underpinning for this argument it is contended that by deferring the hearing on the interim rate increases the Commission violated Sec. 204 of the Communications Act, 47 U.S.C. Sec. 204 (1964), which requires the Commission to give to the hearing and decision of questions relating to rate increases "preference over all other questions pending before it and decide the same as speedily as possible."
 
 
 41
 Whether the AT&T rates in general or the TELPAK rates in particular are too high is a matter for the Commission to decide after investigation and hearing. The Commission has no authority to reject rates summarily on the ground that they are unlawfully high. North Carolina Natural Gas Corp. v. United States, 200 F.Supp. 745, 750 (D.Del.1961); cf. Willmut Gas & Oil Co. v. FPC, 111 U.S.App.D.C. 49, 52-53, 294 F.2d 245, 248-249 (1961), cert. denied, 368 U.S. 975, 82 S.Ct. 477, 7 L.Ed.2d 437 (1962). By the same token this court has no authority to invade the province of the Commission by ordering it to reject a rate, without a hearing, on the ground that it is unlawfully high. Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); United States v. Western Pac. R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed. 2d 126 (1956). See also, Ambassador, Inc. v. United States, 325 U.S. 317, 324, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945). Accordingly, we put aside the petitioners' argument based on the alleged unlawful level of AT&T rates and come to their remaining contention that the Commission was bound to reject the second TELPAK increase because it had not passed upon the lawfulness of the interim tariff.
 
 
 42
 We know of no rule of law that a proposed rate increase must be rejected merely because the lawfulness of a prior rate increase has not been finally determined. Indeed, this court has held to the contrary. See Willmut Gas & Oil Co. v. FPC, 111 U.S.App.D.C. 49, 52-53, 294 F.2d 245, 248-249 (1961), cert. denied, 368 U.S. 975, 82 S.Ct. 477, 7 L.Ed.2d 437 (1962). A carrier is not bound by hoops of steel to every proposal of a rate increase that awaits a hearing. Even assuming that extraordinary factors might preclude a carrier from filing additional rate increases while an investigation of previous increases is pending, the Commission found no such extraordinary factors in this case. We think the Commission's conclusion was not unreasonable. In March 1968, at the time it withdrew the rates proposed on January 9, 1967, to become effective April 1, 1968-rates which were at the levels now challenged by the petitioners -AT&T gave notice that it believed "that in any Commission investigation it will be demonstrated that TELPAK rates should be established at substantially the level of those which were filed to become effective April 1, 1968. The proposed new revisions will constitute an intermediate step in achieving that level." A. 134. AT&T then filed the interim rates, which the Commission suspended for three months. In so doing the Commission emphasized that "It should clearly be understood by the TELPAK users, that, in the event a complete hearing record indicates that increases in the level of TELPAK rates are justified or required, or that the TELPAK classification should be eliminated, any increases occasioned thereby will become effective without delay. The users should henceforth govern themselves accordingly". A. 172. Thus, it was made plain by both AT&T and the Commission that the interim rates were just that -temporary or provisional-and were subject to revision. That revision was proposed in the tariff filed by AT&T on October 1, 1969, as the second step in achieving the level that AT&T believed proper. We see nothing unlawful or unreasonable in this. Nor was it unreasonable, since AT&T contended that the second-step rates were the proper ones, for the Commission to focus the investigation and hearing on those rates, as well as the interim rates.
 
 
 43
 There was a rational basis for the Commission's decision to defer proceedings in Docket No. 18128 pending findings and determinations in phase 1-B of Docket No. 16258 and the TELPAK sharing case, Docket No. 17457. As the Commission explained, a decision on the intricate general questions presented in phase 1-B of Docket No. 16258 and in Docket No. 17457 was necessary, before the Commission in Docket No. 18128 considered the specific problems of the increased TELPAK rates. The Commission believed that the general proceedings should not be complicated by the inclusion of the issues relating to the TELPAK tariffs. This was a matter that the Commission was authorized to decide by Sec. 4(j) of the Communications Act, 47 U.S.C. Sec. 154(j) (1964) which empowers the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." We may not substitute our judgment for that of the Commission as to how it should order its docket. FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940); FCC v. WJR, 337 U.S. 265, 282-283, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); FCC v. Schreiber, 381 U.S. 279, 289, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App. D.C. 262, 269, 387 F.2d 220, 227 (1967). This observation applies with equal force to the contention that the Commission denied the petitioners the speedy hearing required by Sec. 204 of the Communications Act, 47 U.S.C. Sec. 204 (1964). As the Commission observed in American Telephone & Telegraph Co., 26 F.C.C. 101, 103 (1959) the requirement of a speedy hearing in Sec. 204
 
 
 44
 merely requires that the questions pertaining to increased rates shall be decided as speedily as possible. It does not mean that [the Commission] must sacrifice an adequate record in the interest of expediting a determination as to the lawfulness of any rate or that [the Commission] may ignore other pertinent considerations which may be involved.
 
 
 45
 We cannot say that the Commission abused its discretion by adopting the procedures and the timing which in its sound judgment it considered necessary to assure an adequate record in a case involving many complex and difficult problems. In any event, if the petitioners were aggrieved by delay in the Commission's proceedings their remedy was an application to a court for an order requiring expedition; it was not rejection of the proposed rates. See Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4th Cir. 1961); NLRB v. J. H. Rutter-Rex Mfg. Co., 305 F.2d 242 (5th Cir. 1962); M. G. Davis & Co. v. Cohen, 256 F.Supp. 128, 133 n. 7 (S.D.N.Y.), aff'd, 369 F.2d 360 (2d Cir. 1966).
 
 
 46
 We agree with the Commission's conclusion that it was not required to reject the challenged tariff because of alleged violations of the Statement of Rate-Making Principles and Factors. As the Commission noted, any departure from the procedures the Statement outlined may be raised in the hearings in Docket No. 18128. That will be the appropriate time and place for the petitioners to argue that AT&T failed to furnish them seasonably the data supporting the proposed rates.
 
 
 47
 The order of the Commission of April 10, 1968, suspending the proposed interim rates and instituting an investigation into their lawfulness, did not prohibit any further increase without a hearing, but merely stated that any change resulting from a hearing would take place at once. If, as the petitioners contend, the accounting order accompanying the suspension gives them inadequate protection-a matter on which we express no opinion-the fault is with the statutory scheme, not with the Commission.
 
 
 48
 Responding to the charge that it has prejudged the lawfulness of the proposed tariff, the Commission asserted that it did not bargain with AT&T to approve the increased TELPAK rates in return for a reduction in long distance rates; on the contrary, said the Commission, it was plainly understood that AT&T took the risk that the TELPAK rates might be disapproved after a hearing. However this may be, the contention that the Commission has prejudged the lawfulness of the TELPAK rates should be made at the hearing before the Commission, and in the circumstances consideration of the matter at this time is premature. See National Lawyers Guild v. Brownell, 96 U.S.App.D.C. 252, 255, 225 F.2d 552, 555 (1955), cert. denied, 351 U.S. 927, 76 S.Ct. 778, 100 L.Ed. 1457 (1956); SEC v. R. A. Holman & Co., 116 U.S.App.D.C. 279, 323 F.2d 284, cert. denied, 375 U.S. 943, 84 S.Ct. 350, 11 L. Ed.2d 274 (1963). As we said in the Holman & Co. case, 116 U.S.App.D.C. at 282, 323 F.2d at 287:
 
 
 49
 The administrative proceedings cannot be stopped to allow for excursions in the courts with prolonged evidentiary hearings; the time for that in a proper case is when an aggrieved litigant seeks judicial review of agency action having preserved the point of claimed disqualification in the administrative hearing. The party asserting disqualification must make his record in the administrative hearing.
 
 
 50
 The petitioners rely on Cinderella Career & Finishing Schools, Inc. v. FTC, 138 U.S.App.D.C. 152, 425 F.2d 583 (1970), and Texaco, Inc. v. FTC, 118 U.S.App. D.C. 366, 336 F.2d 754 (1964), vacated and remanded on other grounds, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965). In each of these cases, however, the issue of prejudgment was decided on judicial review of final agency action and not in advance of that action. In Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962), also cited by the petitioners, the respondent in a revocation proceeding before the Commission had made a "substantial showing" that one member of the Commission was disqualified, rendering the proceeding void; but the Commission denied the respondent an opportunity to adduce evidence on the facts. Here the petitioners' showing of disqualification can hardly be called substantial, and in any case they will have an opportunity to develop the facts in a hearing.
 
 
 51
 In summary, we cannot find that the challenged TELPAK rates were in violation of any statute, regulation, order of the Commission, or contract. On the other hand we think the record discloses that the Commission, in the reasonable exercise of its discretion, has proceeded in a way that in its judgment will best assure the orderly and proper solution of the difficult and complex problems with which it is confronted. We may not substitute our judgment for that of the Commission.
 
 
 52
 The orders of the Commission are sustained.
 
 MacKINNON, Circuit Judge:
 
 53
 I concur in the majority opinion with two minor reservations. Under the circumstances of this case, I see no need to express an opinion as to whether this court has the power to review the Commission's refusal to suspend a tariff. Compare cases cited at page 1102, supra, with United Telegraph Workers, AFL-CIO v. FCC, 141 U.S.App.D.C. 190, 436 F.2d 920 (1970). Whether or not this court has such power is not an issue in this case since the Commission did suspend the tariff for the full period permitted by law.
 
 
 54
 In addition, I see no need to intimate that the information supplied by a carrier in its transmittal letter may comply with Rule 61.33(a), 47 C.F.R. Sec. 61.33(a) (1970), even though such information does not amount to a prima facie case. See majority opinion at page 1104, supra. Before the Commission none of the parties contended that the transmittal letter was required to set forth a prima facie case, though one party did suggest that AT&T's transmittal letter did not comply with 61.33(a) without specifying the standard against which it contended compliance should be measured. Joint App. 398 et seq. Since the prima facie case standard was not presented to the Commission, I see no need for considering it here. See United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Community Broadcasting Service, Inc. v. FCC, 126 U.S.App. D.C. 258, 377 F.2d 143 (1967); Democrat Printing Co. v. FCC, 91 U.S.App. D.C. 72, 78, 202 F.2d 298, 303-04 (1952).
 
 
 55
 Since the majority opinion does deal with the matter, however, I add the further comment that I do not read the statement that the information contained in the transmittal letter "may be sufficient even though it does not amount to a prima facie case," page 19, supra, to mean that the Commission may not in a proper case reject a tariff for failure of the letter of transmittal to present a prima facie case. The amount of information required to satisfy the Rule at issue here, 47 C.F.R. Sec. 61.33(a) (1970), or the recent amendment of that Rule, 47 C.F.R. Sec. 61.38 (1971), is a subject on which I express no opinion. Compare FCC Report & Order, 35 Fed.Reg. 16247, 16250 (1970).
 
 
 
 [1]
 The orders are a Memorandum Opinion and Order, F.C.C. 69-1196, 20 F.C.C. 2d 383; A. 558, adopted October 29, 1969 and released November 6, 1969, and a Memorandum Opinion and Order denying petitions for reconsideration and other petitions, F.C.C. 70-75, 21 F.C.C.2d 1; A. 724, adopted January 16, 1970, and released January 19, 1970. ("A." throughout this opinion refers to the appendix filed in this court.)
 
 
 [2]
 47 U.S.C. Sec. 203 (1964), which requires that every common carrier must file with the Commission schedules showing all charges and that:
 (b) No change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after thirty days' [sic] notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe; but the Commission may, in its discretion and for good cause shown, modify the requirements made by or under authority of this section in particular instances or by a general order applicable to special circumstances or conditions.
 
 
 [3]
 47 U.S.C. Sec. 204 (1964), which provides:
 Whenever there is filed with the Commission any new charge, classification, regulation, or practice, the Commission may either upon complaint or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing concerning the lawfulness thereof; and pending such hearing and the decision thereon the Commission, upon delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such charge, classification, regulation, or practice, but not for a longer period than three months beyond the time when it would otherwise go into effect; and after full hearing the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of the suspension, the proposed change of charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased charge, the Commission may by order require the interested carrier or carriers to keep accurate account of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased charges as by its decision shall be found not justified. At any hearing involving a charge increased, or sought to be increased, after the organization of the Commission, the burden of proof to show that the increased charge, or proposed increased charge, is just and reasonable shall be upon the carrier, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible.
 
 
 [4]
 The Commission explained:
 The Commission in its Memorandum Opinion and Order of July 16, 1968, 13 F.C.C.2d 853, deferred proceedings in Docket No. 18128 pending a determination with respect to the proceedings in Phase 1-B of docket No. 16258 and the Telpak Sharing case, Docket No. 17457. Since that time, the Chief, Common Carrier Bureau, has issued a Recommended Decision in Docket No. 17457, which is now pending before us. Furthermore, the parties in Phase 1-B of Docket No. 16258 have entered into an agreement as to ratemaking principles and factors looking toward determining that phase (see 18 F.C.C.2d 761, 765). We also note that the cost studies submitted by AT & T in support of the proposed Telpak revisions assume a continuation of the sharing provisions as now in effect. Under such circumstances, we will no longer defer the proceedings in Docket No. 18128, and the examiner presiding in that case is authorized to schedule hearings therein at such time as he may deem appropriate. 20 F.C.C.2d at 387-388; A. 563.
 
 
 [5]
 The petitioners sought review in this court pursuant to Sec. 2 of the Judicial Review Act of 1950, 28 U.S.C. Sec. 2342 (Supp. IV, 1969) and Sec. 402(a) of the Communications Act of 1934, as amended, 47 U.S.C. Sec. 402(a) (1964). On January 29, 1970 this court denied petitioners' motions for a stay
 
 
 [6]
 Brief for Petitioner, National Association of Motor Bus Owners, at 12
 
 
 [7]
 Brief for the Airline Industry Petitioners at 47-48
 
 
 [8]
 See Brief for the Airline Industry Petitioners at 20; Brief for Petitioner, Aerospace Industries Ass'n of America, Inc., at 11
 
 
 [9]
 See Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed. 2d 312 (1968); FPC v. Hunt, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); Amerada Petroleum Corp. v. FPC, 293 F.2d 572 (10th Cir. 1961), cert. denied, 368 U.S. 976, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962); United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); Isbrandtsen Co. v. United States, 93 U. S.App.D.C. 293, 211 F.2d 51, cert. denied sub. nom., Japan Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954); Seatrain Lines, Inc. v. United States, 168 F. Supp. 819 (S.D.N.Y.1958)