570 F.2d 452
 INTERNATIONAL BUSINESS MACHINES CORPORATION et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company et al., Intervenors.
 Nos. 60, 61, 62, Dockets 77-4005, 77-4020 and 77-4059.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1977.
Decided Feb. 6, 1978.
 
 J. Roger Wollenberg, Washington, D. C. (Wilmer, Cutler & Pickering, Washington, D. C., David R. Anderson, Roger M. Witten, John H. Harwood II, Erica A. Ward, Washington, D. C., Cravath, Swaine & Moore, New York City, Thomas D. Barr, Robert F. Mullen, Ronald S. Rolfe, New York City, J. Gordon Walter, Armonk, N. Y., of counsel), for petitioner International Business Machines Corp.
 
 
 1
 Terry G. Mahn, Arlington, Va., for petitioner Computer & Communications Industry Association.
 
 
 2
 Joseph M. Kittner, Washington, D. C. (McKenna, Wilkinson & Kittner, Washington, D. C.; Edward P. Taptich, Virginia S. Carson; Howrey & Simon, Washington, D. C., John S. Voorhees, Washington, D. C., of counsel), for petitioner Computer and Business Equipment Manufacturers Association.
 
 
 3
 Jack David Smith, Counsel, F.C.C., Washington, D. C. (Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Dept. of Justice, Washington, D. C., John H. Shenefield, Acting Asst. Atty. Gen., Barry M. Grossman, Peter L. Delacruz, Attys., Washington, D. C., of counsel), for respondents and Federal Communications Commission and United States of America.
 
 
 4
 Thomas J. O'Reilly, Washington, D. C. (Chadbourne, Parke, Whiteside & Wolff, Washington, D. C., of counsel), for intervenor United States Independent Telephone Association.
 
 
 5
 Michael Boudin, Washington, D. C. (Timothy A. Harr, Washington, D. C., Alfred A. Green, New York City, George Finkelstein, Newark, N. J., Edgar Mayfield, Bedminster, N. J.; F. Mark Garlinghouse, New York City, of counsel), for intervenor American Telephone and Telegraph Co.
 
 
 6
 Before FEINBERG and MESKILL, Circuit Judges, and BRYAN, District Judge.*
 
 FEINBERG, Circuit Judge:
 
 7
 Petitioners, International Business Machines Corporation and two trade associations representing companies in the computer and communications industry,[1] seek review of a Federal Communications Commission (FCC) order that permitted the American Telephone and Telegraph Company (AT&T) to market a new service designated Dataspeed 40/4. The challenged administrative action grew out of the filing by AT&T of so-called tariff revisions, which constituted notice of an intention to offer the service under an appended schedule of rates. By its order, 62 F.C.C.2d 21 (1977), the FCC allowed the tariff revisions to become operational.[2]
 
 
 8
 The Dataspeed 40/4 is a complex of small machines with the cumulative capacity to send and receive messages from a central computer. There is a teletypewriter keyboard for entering messages, a teletypewriter printer for receiving them, and a viewing screen that displays incoming and outgoing information. Outgoing messages can be stored, reviewed, and revised prior to transmission. The Dataspeed 40/4 is more than a conventional teletypewriter, given its enhanced capabilities for storage, correction, and transmission of data, and less than a computer, in that it does not alter the substantive content of the messages typed into or received by it. Therein lies the difficulty, for a principal issue before us is whether the FCC correctly classified the Dataspeed 40/4 as a "communications," as opposed to a "data processing," instrument.
 
 
 9
 Petitioners argue that the FCC order was defective because of the alleged classification error and because AT&T submitted insufficient data in support of its proposed tariffs. We reject both contentions, and deny the petitions for review.
 
 
 10
 * If the FCC had concluded that the Dataspeed 40/4 belonged in the "data processing" category, it would have been compelled to deny AT&T's application for permission to offer the service under tariff. The Commission's rules prohibit common carriers subject to its jurisdiction from furnishing data processing services unless they do so through subsidiaries with separate officers, operating personnel, and books of account.[3] This policy reflects a concern that failure to observe these safeguards might result in the offering of data processing services by a common carrier at artificially low rates, made possible by a "cross subsidy" exacted from consumers of other, regulated services provided by the carrier. The Commission desired in addition to promote "efficient telephone service to the public by eliminating the possibility of a diversion of facilities to other purposes." GTE Service Corporation v. FCC, 474 F.2d 724, 732 (2d Cir. 1973).
 
 
 11
 The FCC's decision to allow AT&T to market the Dataspeed 40/4 without spinning off a subsidiary for the purpose was at odds with the conclusion earlier reached by the Chief of the Common Carrier Bureau, to whom the tariff revisions went initially for review.[4] In reversing the Bureau Chief, the Commission conceded that the question was a close one, but maintained that its rules on data processing offerings did not prohibit selling services for communicating with central computers, as opposed to making available the data processing capabilities of the central computers themselves. The Commission recognized that technological advances subsequent to the promulgation of the rules had blurred the distinction between terminal devices used to communicate with computers and the computers receiving the transmissions; and the Commission pledged itself to reexamine through the vehicle of a rule-making proceeding "issues raised by a carrier's provision of peripheral devices which might be considered data processing activities . . .."[5]
 
 
 12
 Since there is no real dispute as to the nature and functions of the Dataspeed 40/4, petitioners' challenge to the FCC's classification is an invitation to second-guess a specialized agency's application of its own rules to stipulated facts. Mindful of the deference due agency conclusions under such circumstances, we are not disposed to intervene. The FCC's restrictions on data processing offerings originated in a desire to prevent sales of off-peak computer time by common carriers which had discovered that computers used to provide communication services could be programmed for other tasks as well.[6] Thus, the relevant rules define "data processing" as "the use of a computer for the processing of information . . .." 47 C.F.R. § 64.702(a)(1) (emphasis supplied). Subsection (a)(4) distinguishes between a "central computer" and "remote customer terminals." The FCC argues that a rule making such distinctions and focusing on "the use of a computer" cannot be read to prevent the offering of remote access devices designed to interact with central computers. Given the present limited capabilities of the Dataspeed 40/4, the Commission was justified in concluding that the device did not represent an effort to resurrect the practices against which the prohibitions are directed. Also unexceptionable is the Commission's determination that the Dataspeed 40/4 "is similar in kind" to "established communications devices" and hence a proper candidate for tariffing under the Communications Act.[7]
 
 
 13
 Petitioners fear that the approval of the Dataspeed 40/4 will spawn an effort by common carriers to market over more sophisticated "terminals" that will ultimately be computers in all but name, yet escape interdiction by virtue of their formal status as appendages to a centralized data processing unit. However, such concerns are belied by the Commission's obvious awareness of the problem and initiation of inquiries designed to eliminate it.[8]
 
 II
 
 14
 Petitioners also contend that, regardless of whether or not the Dataspeed 40/4 was correctly classified, the supporting material submitted by AT&T to justify its proposed tariff revisions was inadequate. The starting point of their argument is the statutory requirement that, as to interstate communication services provided by common carriers, "(a)ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable . . . ." 47 U.S.C. § 201(b). To aid enforcement, the statute mandates the filing of tariffs with the FCC showing charges for interstate communication services and containing "such other information . . . as the Commission may by regulation require." 47 U.S.C. § 203(a). The FCC may reject proposed tariffs it considers unlawful, or suspend them pending an investigation under 47 U.S.C. § 204. Review of the tariffs is conducted pursuant to Section 61.38 of the Commission's Rules, 47 C.F.R. § 61.38, which sets guidelines concerning the information to be submitted by carriers with their proposed tariffs. Petitioners contend that the data accompanying the Dataspeed 40/4 tariff was insufficient to meet the Section 61.38 requirements, precluding a valid FCC finding that the proposed rates did not reflect unlawful cross-subsidization by users of other AT&T services.
 
 
 15
 The submission that petitioners criticize as grossly inadequate consisted of more than 140 pages of data and explanatory material. Included were (1) an analysis of the nature of the new service and the reasons for making it available; (2) a description of the way the projected rates had been calculated; and (3) an economic data sheet, with supporting addenda, that projected the effects of the new product on AT&T's revenues and sales traffic for a three-year period. A comparison of the subsections of this voluminous material and the provisions of Section 61.38 supports the FCC's conclusion that AT&T "substantially complied with the requirements of Section 61.38 and . . . clearly complied with the specific components thereof in terms of the economic data submitted, justification for the filing, and the basis for the rates selected." 62 F.C.C.2d at 32. Petitioners respond that, although properly labelled documents may have been filed, the data supporting AT&T's conclusions were insufficient to rule out the possibility of cross-subsidization.
 
 
 16
 Petitioners' argument suggests a misapprehension of the nature of the inquiry Section 61.38 was designed to assist. The FCC has stated that this rule was intended to "facilitate the Commission's judgment as to whether . . . proposed tariffs present questions of lawfulness which warrant our investigation and hearing." Amendment of Part 61 of the Commission's Rules Relating to Tariffs and Part 1 of the Commission's Rules Relating to Evidence,25 F.C.C.2d 957 (1970), recon. denied, 40 F.C.C.2d 149, 153 (1973). The supplementary procedures referred to may be implemented by the Commission in its discretion, 47 U.S.C. § 204, and afford a means for requiring a tariff proponent to justify its application more fully. But Section 61.38 itself, like its closely analogous predecessor construed by the District of Columbia Circuit in Associated Press v. FCC, 145 U.S.App.D.C. 172, 181, 448 F.2d 1095, 1104 (1971), does not require submissions to establish a prima facie case for the lawfulness of the tariffs they support. AT&T et al., Charges for Interstate Telephone Service, 42 F.C.C.2d 293, 300-01 (1973), aff'd sub nom. Nader v. FCC, 520 F.2d 182 (D.C. Cir. 1975). If such submissions comply on their face with the section's requirements and the FCC has declined to reject or suspend them, the failure to rule out all possibility of cross-subsidization will not lead a reviewing court to brand the agency action as arbitrary and capricious. If petitioners' concerns as to the computation of the Dataspeed 40/4 rates are well founded, they can obtain relief by filing a complaint under Section 208 of the Communications Act, 47 U.S.C. § 208. The Commission's failure to reject a tariff does not preclude subsequent § 208 challenges to its lawfulness. Brentwood Co., 37 F.C.C.2d 498, 499 (1972); AT&T Long Lines Department, 46 F.C.C.2d 13, 14 (1974).
 
 
 17
 Petitioners are, of course, correct in asserting that Section 61.38 provides for more than "a rote exercise" involving merely the filing of "pieces of paper bearing an appropriate heading." It suffices to note that our examination of the pertinent record reveals far more than appropriate headings.[9] Given the nature of the AT&T filing and petitioners' continuing opportunity to raise their allegations in a section 208 complaint, we cannot brand the FCC's failure to demand additional information or to take more drastic action as an abuse of discretion.
 
 
 18
 Finally, petitioners urge that the FCC arbitrarily and capriciously failed to explain its rejection of their various claims and requests for relief with regard to the alleged inadequacy of the AT&T submission, necessitating a remand for clarification. This argument is without merit.[10] In finding that AT&T was in compliance with Section 61.38, the FCC was affirming a holding to that effect by the Chief of the Common Carrier Bureau;[11] the Commission cited the categories of data required by the rule, noted that AT&T had provided them, and observed that petitioners' objections "address problems which are beyond the scope of Section 61.38."[12] 62 F.C.C.2d at 32. For reasons already stated, we find these statements amply supported by the record. Taken as a whole, the Commission's order is far from the "collection of conclusory comments" condemned in one of the cases relied upon by petitioners. West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968). Nor did it hamper us in the effective exercise of judicial review. Cf. Columbia Broadcasting System v. FCC, 147 U.S.App.D.C. 175, 182, 454 F.2d 1018, 1025 (1971).
 
 
 19
 The petitions for review are denied and the order of the Commission is sustained.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The trade associations are the Computer and Business Equipment Manufacturers Association and the Computer & Communications Industry Association. For purposes of conciseness, we do not differentiate between the petitioners in the discussion that follows
 
 
 [2]
 The Commission denied a motion by petitioner Computer & Communications Industry Association for a stay of the order. AT&T, 62 F.C.C.2d 539 (1977). A panel of this court denied a similar motion on January 25, 1977
 
 
 [3]
 See 47 C.F.R. § 64.702(c). The option of offering data processing services via subsidiaries is apparently not available to AT&T, because of the terms of a consent decree entered into by the company in 1956. United States v. Western Electric Co., Inc. and AT&T, 1956 Trade Cas. P 68,246 (D.N.J.1956) (AT&T to restrict offerings to "common carrier communications services," defined as "communications services and facilities . . . the charges for which are subject to public regulation.")
 
 
 [4]
 AT&T Revisions to Tariffs, FCC Nos. 260 and 267, Memorandum Opinion and Order of the Chief, Common Carrier Bureau (released March 3, 1976)
 
 
 [5]
 62 F.C.C.2d at 31. Noting that it had already initiated a rule-making inquiry "pertaining to the definitional structure" of 47 C.F.R. § 64.702, the FCC indicated its intention to enlarge the scope of that proceeding to encompass the issues raised by the instant case. 62 F.C.C.2d at 31. Pursuant to this end, the FCC has extended the period allotted to the filing of comments, 62 F.C.C.2d 413 (1977), and, we are told, has issued a Supplemental Notice of Inquiry suggesting a new approach to the definition of "data processing."
 
 
 [6]
 See GTE Service Corp. v. FCC, supra, 474 F.2d at 728; and the FCC decision modified therein, Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 28 F.C.C.2d 267 (1971)
 
 
 [7]
 62 F.C.C.2d at 30. The "wire communication" services which must be tariffed under 47 U.S.C. § 203(a) include "all instrumentalities, facilities, apparatus, and services . . . incidental to . . . transmission." 47 U.S.C. § 153(a). Given the breadth of this definition and the unwillingness of courts to read the FCC's jurisdiction narrowly, see, e. g., General Telephone Co. of Southwest v. United States, 449 F.2d 846, 853 (5th Cir. 1971), disturbing the FCC's determination would require impermissible judicial interference with an agency's interpretation of the statute it administers. Cf. Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966)
 
 
 [8]
 See note 5 supra. Petitioners' prophecies of dire repercussions are further undercut by the Commission's cautionary observation that
 The analysis and rationale used herein may not be given any broader application than the factual situation presented by the Dataspeed 40/4 offering. It should be made clear that we consider the Dataspeed 40/4 offering as one which approaches the borderline between communications and data processing. A further variation in the functions performed by the Dataspeed 40/4 might alter the nature of the service being offered.
 
 
 [62]
 F.C.C.2d at 31. The Commission's tentative approach is underscored by Chairman Wiley's observation in his concurring opinion that "this decision should be viewed as a conclusion of transitory import." 62 F.C.C.2d at 33-34
 
 
 [9]
 The three year projections included in the AT&T submission, to which petitioners' principal objections are directed, were supported by a nine-page "Description of Basis of Market and Revenue Estimates" (citing sources for, and displaying estimates of, market potential); a 21-page "Description of Cost Studies and Results" (describing the calculation of costs used in determining Dataspeed 40/4 rates, including, inter alia, pre-delivery labor, projected wage increases, field stock, supply expense, sales tax, tax deferral, installation labor, engineering costs, and return on investment); and 106 pages of tabular material (providing detailed breakdowns of the elements summarized in the "Description of Cost Studies and Results")
 
 
 [10]
 Insofar as the argument can be read to extend to the FCC's treatment of the classification issue, it fails even more conspicuously. The Commission's defense of its decision to characterize the Dataspeed 40/4 as a "communications" device was comprehensive, 62 F.C.C.2d at 27-31, and there was no reason to add an explanation of the lack of necessity for suspending the tariff prior to still further consideration of an amply supported conclusion
 
 
 [11]
 The opinion of the Bureau Chief, other aspects of which were reversed by the FCC order, is cited in note 4 supra
 
 
 [12]
 Petitioners complain that the FCC gave no reasons for declining to suspend the tariff and order an investigation, as it is empowered to do under 47 U.S.C. § 204. There is, however, no statutory requirement of a statement of reasons, and determinations not to suspend tariffs pending an investigation have been characterized as immune from judicial review. Associated Press v. FCC, supra, 448 F.2d at 1103