561 F.2d 365
 182 U.S.App.D.C. 367
 MCI TELECOMMUNICATIONS CORPORATION, Microwave
Communications, Inc., and N-Triple-C Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, United States
Independent Telephone Association, Data
Transmission Company (DATRAN), and
Southern Pacific
Communications
Company,
Intervenors.
 No. 75-1635.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 28, 1977.
Decided July 28, 1977.
 
 Kenneth A. Cox, Washington, D.C., with whom Michael H. Bader, William J. Byrnes, and Raymond C. Fay, Washington, D.C., were on the brief, for petitioners.
 John E. Ingle, Counsel, F.C.C., Washington, D.C., with whom Werner K. Hartenberger, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and Carl D. Lawson, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 Ashton R. Hardy, Gen. Counsel for the F.C.C., Washington, D.C., at the time the record was filed, entered an appearance for respondent F.C.C.
 
 
 2
 James F. Ponsoldt, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent United States of America.
 
 
 3
 Michael Boudin, Washington, D.C., with whom Craig D. Miller, Washington, D.C., and Alfred C. Partoll, and F. Mark Garlinghouse, New York City, were on the brief, for intervenor Am. Tel. and Tel. Co.
 
 
 4
 Thomas J. O'Reilly, Washington, D.C., was on the brief for intervenor United States Independent Tel. Ass'n.
 
 
 5
 John M. Scorce and Kevin H. Cassidy, Vienna, Va., were on the brief for intervenor Data Transmission Co.
 
 
 6
 Herbert E. Forrest, Washington, D.C., entered an appearance for intervenor Southern Pacific Communications Co.
 
 
 7
 Before J. SKELLY WRIGHT, TAMM and WILKEY, Circuit Judges.
 
 
 8
 Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.
 
 J. SKELLY WRIGHT, Circuit Judge:
 
 9
 This is a petition to review two orders of the Federal Communications Commission, each of which requires petitioner MCI Telecommunications Corporation to cease and desist from offering and operating its "Execunet" telephone service.[1] Finding that the Commission has not taken the steps required by the Communications Act of 1934, 47 U.S.C. § 151 et seq. (1970), to restrict the services MCI may offer over its existing facilities, we reverse.
 
 I. BACKGROUND
 
 10
 MCI Telecommunications Corporation, Microwave Communications, Inc., and N-Triple-C Inc. (hereinafter, collectively, MCI) are affiliated communications common carriers which operate a transcontinental point-to-point microwave system catering to business and data communications markets. In the vernacular of the trade MCI is a "specialized common carrier."
 
 
 11
 The present dispute has its roots in MCI's September 1974 filing of revisions to its tariffs F.C.C. No. 1 the tariff under which MCI furnishes all its interstate services. Those revisions, which became effective October 10, 1974, established rates for a class of "metered use" services, among which was Execunet.[2] With Execunet a subscriber using any push-button telephone (or rotary dial phone and tone generator) can reach any telephone in a distant city served by MCI simply by dialing a local MCI number followed by an access code and the number in the distant city. Execunet customers are billed for each call on a time and distance basis, subject to a monthly minimum.[3]
 
 
 12
 In the spring of 1975 intervenor AT&T, after subscribing to Execunet and procuring Execunet marketing brochures, complained orally to the Commission that MCI was offering interstate long distance message telephone service (MTS) under the guise of Execunet and that no such service could properly be tariffed by MCI. Apparently AT&T representatives approached individual commissioners and various Commission staff personnel with this complaint and even held a demonstration of Execunet in the Commission's offices. Subsequent to the ex parte complaints, AT&T filed with the Commission a letter which repeated the allegations previously made.
 
 
 13
 The Commission forwarded AT&T's letter to MCI and indicated that MCI's "comments on this matter would be appreciated."[4] MCI wrote a series of letters in return. In the first it took the position that AT&T's complaint was untimely and should be rejected, but that in any case Execunet was a "private line" service which MCI was authorized to offer.[5] By a further letter MCI complained of AT&T's ex parte "lobbying" and asked for an opportunity to present its side of the dispute to the Commission.[6] In a third letter MCI pointed out that its licenses were not limited by anything in Section 21.705 of the Commission's rules[7] pursuant to which point-to-point microwave radio licenses are issued to communications common carriers.[8] It also called the Commission's attention to AT&T's comments in Rulemaking Docket 19117,[9] in which AT&T had taken the position that the Commission had no statutory authority to require prior approval of new services that were to be offered over existing facilities of a domestic carrier, but instead could regulate such services, if at all, only under the tariff provisions of the Communications Act. In MCI's view, AT&T's position in Docket 19117[10] denies the authority asserted by the Commission in the instant proceeding on AT&T's behalf. MCI also pointed out that the report in Docket 19117 states that new service offerings could be proposed by merely filing a tariff.[11]
 
 
 14
 Without holding a hearing or even disclosing the details of AT&T's arguments concerning the unlawfulness of Execunet, the Commission on July 2, 1975 wrote a letter to MCI which stated: "(Y)our tariff F.C.C. No. 1 is hereby rejected insofar as it purports to offer Execunet service, but without prejudice to MCI's offering any other service which you are authorized to provide."[12] The rationale for this order was explained in the body of the letter.
 
 
 15
 First, the Commission concluded that MCI could offer only "private line" communications services over its existing facilities:
 
 
 16
 In the various Commission orders granting the Section 214 applications of the MCI carriers to construct and operate facilities (e. g., 32 F.C.C.2d 36 (1971), FCC 72-456 (May 26, 1972), FCC 72-832 (September 22, 1972), FCC 72-852 (September 29, 1972)), appears language similar to the following:
 
 
 17
 The service proposed is essentially private line for the transmission of data, facsimile, control, remote metering, voice and other communications.
 
 
 18
 Each grant refers to the paragraph which incorporates the above language as conditioning the grant of construction and operating authority. As a result, MCI is only permitted to operate its facilities for private line services.
 
 
 19
 Further, in our Second Report on domestic satellites, which followed the Specialized Common Carrier decision, we pointed out (35 F.C.C.2d 844, 853 (1972)):
 
 
 20
 In encouraging multiple entry and the development of competition in the supply of domestic communications, we have maintained a distinction between the so-called monopoly switched telephone services now being furnished by AT&T and all other classes of existing and potential specialized services.
 
 
 21
 It is thus clear that MCI sought authorization to offer only private line services, and that it was granted authority to offer only such services.[13]
 
 
 22
 The Commission then rejected MCI's arguments that Execunet was a private line service like AT&T's "foreign exchange" (FX) service, deciding instead that "the combination of * * * similarities" between Execunet and AT&T's MTS made Execunet "essentially a switched public message telephone service * * *."[14]
 
 
 23
 MCI immediately filed a petition for review in this court and sought a stay of the Commission's order, arguing that the Commission had failed to comply with Section 4 of the Administrative Procedure Act,[15] its own rules governing informal complaints,[16] its own rules governing ex parte contacts,[17] Sections 204 and 205 of the Communications Act, 47 U.S.C. §§ 204-205 (1970), and the Due Process clause. The request for a stay was granted.[18] Subsequently the Commission, which had previously refused to allow MCI any kind of hearing, moved to have the proceedings remanded so that it could consider matters more fully than it had previously. This motion was granted, although jurisdiction was retained.
 
 
 24
 In December 1975 the Commission issued an order commencing the proceedings on remand. MCI Telecommunications Corp., 57 FCC2d 271 (1975), SA 49.[19] It announced that comments and reply comments would be accepted and that oral argument or an evidentiary hearing might be held if warranted by the written submissions. The issue to be resolved was said to be "whether or not Execunet is a service which MCI is authorized to offer pursuant to its facility authorizations and policies set forth by this Commission."[20] On March 26, 1976 the Commission announced that it would hold oral argument and designated the issues to be addressed at that time. The issues the Commission identified as having been raised by the comments and reply comments were the following:a. What class or classes of service is MCI permitted to offer pursuant to its facility authorizations and Commission policies?
 
 
 25
 b. What changes, if any, were made to the permitted classes of service by our Report and Order in Docket 19117, 39 FCC2d 131 (1973)?
 
 
 26
 c. Is Execunet service, as presently offered, a private line service?
 
 
 27
 d. Were any communications between parties to this proceeding and the Commission, as developed by filings herein, in violation of any applicable statute or regulation?
 
 
 28
 e. If any prohibited contacts occurred, what effect have they had on the substance of this proceeding?
 
 
 29
 f. Whether any further proceedings are required to comport with the requirements of due process of law.
 
 
 30
 MCI Telecommunications Corp., 58 FCC2d 962, 963 (1976), SA 812.
 
 
 31
 Prior to oral argument the Commission issued yet a third order responding to procedural motions made by MCI at various points during the comment period. MCI Telecommunications Corp., --- FCC2d --- (FCC 76-441, May 17, 1976), SA 892. In this order the Commission rephrased the primary issue before it as "whether MCI's facility authorizations and Commission policies restrict in any way the broad categories of service which MCI may offer."[21] It also stated that the proceedings would not be expanded to include consideration of "whether it is in the public interest for MCI to offer Execunet regardless of whether it is within the class of services it may offer."[22] Finally, the Commission for the first time mentioned the statutory authority for its actions: "th(is) proceeding is an investigation into the lawfulness of MCI's Execunet service offering, conducted pursuant to Sections 4(i), 4(j), 201, 204, 205, 208 and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 201, 204, 205, 208 and 403."[23]
 
 
 32
 After oral argument the Commission issued an extensive opinion, again finding that MCI was not authorized to offer Execunet. MCI Telecommunications Corp., 60 FCC2d 25 (1976). The approach taken in that opinion is materially different from that taken in the July 1975 letter order, however. Whereas the letter order had relied on express restrictions written into MCI's facilities authorizations (the certificates of public convenience and necessity issued pursuant to Section 214(a) of the Communications Act, 47 U.S.C. § 214(a) (1970)),[24] the opinion on remand stated:
 
 
 33
 As MCI points out, however, not all of its authorizations contain similar language (i. e., restrictions), some contain no such restrictions, and thus it is necessary to look further, to our expressed policies and to judicial statements, to ascertain the limits on (specialized common carrier) services.[25]
 
 
 34
 The Commission's "further look" began with a review of the seminal Specialized Common Carrier decision,[26] pursuant to which most specialized carrier facilities authorizations have been issued. The purpose of that decision was to facilitate the Commission's handling of Section 214 applications by determining by rulemaking "(w)hether as a general policy the public interest would be served by permitting the entry of new carriers in the specialized communications field * * *."[27] While the Commission apparently concedes that it did not define the boundaries of the "specialized communications field,"[28] it asserts that the services to be offered over the facilities covered in some 1,700 Section 214 applications before it provided a touchstone for its analysis and that all such services were "private line." Accordingly, it is the Commission's position that it did not consider services other than private line services in determining the public interest ramifications of competition.[29] As an example of this the Commission points to its analysis of "cream-skimming," the argument that specialized carriers will upset the established rates of general carriers (such as AT&T) by siphoning off high-profit business.[30] The Commission's interpretation here of its discussion of cream-skimming in Specialized Carriers is that it found allegations of cream-skimming to be unfounded only because the specialized carriers were not proposing to compete "to any substantial degree" with AT&T's monopoly service offerings, MTS and WATS.[31]
 
 
 35
 Having concluded that the Specialized Common Carrier decision makes no reference to competition in other than private line areas, the Commission turned next to MCI's allegations concerning the meaning of the Commission's Rule 21.705, 47 C.F.R. § 21.705 (1976), and its orders in Docket 19117.
 
 
 36
 Rule 21.705 governs the scope of licenses granted carriers in the point-to-point microwave service. Its operative language is that a carrier may offer any service "provided for in the legally applicable tariffs of the carrier, unless otherwise directed in the applicable instrument of authorization * * * " (emphasis added). MCI, focusing on the second phrase, had argued that the absence of any directions in its instruments of authorization indicated that it was free to offer by tariff any communications service that could physically be provided on its existing system. The Commission, on the other hand, took the position that the italicized language is the key and that tariffs exceeding the bounds of the Specialized Carrier decision can never become "legally applicable." Thus in the Commission's view Rule 21.705 merely "expresses the truism that a carrier need not generally file an application (under Section 214) for each new service it wishes to offer, (and therefore) it cannot be used to reverse a clearly defined Commission policy."[32]
 
 
 37
 The Commission takes a similarly narrow view of the effect of its Report and Order in Docket 19117. That docket was started to consider whether domestic carriers should be required to get Commission approval before filing tariffs proposing services not previously provided or set out in a Section 214 application.[33] The purpose of the proposed rules was threefold: to decide the public interest ramifications of a service before it was commenced, thereby protecting the public from service disruptions that might be caused if the service were allowed to go into effect and later enjoined; to put general domestic carriers (such as AT&T and Western Union), which could theretofore start a new service simply by filing a tariff, on an equal footing with international and domestic miscellaneous carriers whose facilities authorizations were always restricted so that new services required further Section 214(a) proceedings; and to protect entrants to the specialized carrier field who also needed prior approval of entry under Section 214(a) from unfair competition from the generalized carriers.[34] The proposed rules were never adopted, and restrictions in facilities authorizations which had worked a result similar to the proposed rules were expressly declared "null and void" in the order terminating the docket.[35]
 
 
 38
 MCI argued before the Commission that the result of Docket 19117 was that any express restrictions in its facilities authorizations were lifted and that it should be free as a result of the order terminating the docket to propose new services simply by filing a tariff, even if it was not free before. The Commission's response was that Docket 19117 was not concerned with competition except in the specialized carrier field the only field in which competition was allowed at the time of the Report and Order in that docket.[36] Thus the Commission's view apparently is that existing specialized carriers are allowed to offer private line services free of any prior approval requirement as a result of Docket 19117, but are required to proceed by Section 214 application with respect to all other services.
 
 
 39
 In the remainder of the opinion below the Commission again concluded that Execunet was not a private line service.[37] It also concluded that no facts were in dispute which required an evidentiary hearing and denied MCI's motion for one.[38] The Commission for a second time refused to consider whether Execunet should be permitted regardless of the scope of the Specialized Common Carrier decision, and further indicated that it had intended to confer on AT&T a monopoly over MTS and WATS by its ruling in Specialized Carriers, a decision that could not be changed absent a demonstration of changed circumstances.[39] Finally, the Commission refused to inquire further into the ex parte contact problem on the ground that all such contacts had occurred before commencement of formal proceedings and were, therefore, proper under both court and Commission rulings.[40]
 
 
 40
 On this petition for review MCI has challenged virtually every ruling of the Commission in the proceeding on remand and has renewed its attack on the July 1975 letter order.
 
 II. ANALYSIS
 A.
 
 41
 The implicit restrictions argument advanced by the Commission in its opinion on remand represents a substantial departure from prior administrative practice. As the Commission's letter order suggests, the usual way in which a carrier becomes restricted in the services it may offer is for the Commission to write restrictions into the facilities authorizations that must be obtained pursuant to Section 214 of the Communications Act before any communications line may be built, operated, or extended.[41] Accordingly, a carrier can usually tell if it is subject to service restrictions simply by examining the instruments of authorization issued to it by the Commission. Section 21.705 of the Commission's rules, 47 C.F.R. § 21.705 (1976), which governs the manner in which point-to-point microwave radio licenses can be used by specialized carriers such as MCI, similarly recognizes that the usual place to find restrictions on services is in the "applicable instrument of authorization." See also 47 U.S.C. § 309(h)(1) (1970) (which indicates that restrictions will usually be found in the license instrument); 47 C.F.R. § 21.903(b) (1976) (instrument of authorization controls in part services that may be offered on a multi-point distribution system).
 
 
 42
 The Commission's discussion of its administrative practice in Docket 19117 is also instructive. There the Commission explained that in the absence of restrictions imposed under Section 214 in the facilities authorizations, carriers could offer any service which could physically be provided over their existing systems simply by filing a tariff.[42] This discussion clearly indicates that the Commission's understanding of Section 214 of the Act has until now been that explicit action is necessary to restrict a carrier to the service offerings it proposed when it sought authority to build, operate, or extend its communications lines.
 
 
 43
 Finally, as evidenced by the decision in Press Wireless, Inc., 25 FCC 1466 (1958), aff'd, sub nom. Press Wireless, Inc. v. FCC, 264 F.2d 372 (D.C. Cir. 1959) (per curiam ), the Commission has from time to time exercised its express authority under Section 303(b) of the Act, 47 U.S.C. § 303(b) (1970), to "(p) rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class" by promulgating rules setting out limitations on services to be offered over radio facilities. See, e. g., 47 C.F.R. §§ 21.509, 21.606, 21.903 (1976). In this regard it is instructive to note that the Commission has not enacted any comparable service restrictions for point-to-point microwave licensees and in particular it has not made the definition of "private line service" set out in 47 C.F.R. § 21.2 (1976) applicable to such licenses, although this would certainly seem to be the natural thing to have done had the Commission sought to restrict specialized carriers to private line service offerings.
 
 
 44
 The fact that an administrative practice is novel does not, of course, mean that it is wrong. However, novelty is a warning signal that all may not be well, especially in the instant case in which the Commission has itself failed to discuss the statutory warrant for the new course it has adopted. When the Communications Act is considered in detail, it becomes apparent that novelty has led to error in this case.
 
 B.
 
 45
 To frame our analysis, we sketch at the outset some principles which are either uncontested or uncontestable. First, it is settled that "a tariff (may) be rejected if it is unlawful without prior agency approval and approval has not been obtained." Associated Press v. FCC, 145 U.S.App.D.C. 172, 448 F.2d 1095, 1103 (1971); accord, Press Wireless, Inc. v. FCC, supra.[43] Yet the power to require prior agency approval is itself circumscribed, for it is well recognized that the tariff provisions of the Communications Act (Sections 203-205, 47 U.S.C. §§ 203-205),[44] like the cognate sections of the Interstate Commerce Act (49 U.S.C. §§ 15(1), 15(7) (1970)),[45] embody a considered legislative judgment that carriers should in general be free to initiate and implement new rates or services over existing communications lines unless and until the Commission, after hearing, determines that such rates or practices are unlawful, subject only to a limited period of suspension set out in the statute. AT&T v. FCC, 487 F.2d 865, 870-881 (2d Cir. 1973); see United States v. SCRAP, 412 U.S. 669, 697, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (interpreting Interstate Commerce Act); Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 662-669, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) (same).[46] As the Second Circuit explained in the AT&T case in overturning a Commission requirement that AT&T obtain approval prior to filing tariff revisions:
 
 
 46
 In enacting Sections 203-05 of the Communications Act, Congress intended a specific scheme for carrier initiated rate revisions. A balance was achieved after a careful compromise. The Commission is not free to circumvent or ignore that balance. Nor may the Commission in effect rewrite this statutory scheme on the basis of its own conception of the equities of a particular situation.[47]
 
 
 47
 The Second Circuit, moreover, rejected the Commission's argument that the general grants of procedural authority in Sections 4(i), 4(j), and 403 of the Act, 47 U.S.C. §§ 154(i), 154(j), 403 (1970), empowered the Commission to erect prior approval requirements like that imposed on AT&T, although it recognized that the Commission would have the power to reject a tariff whenever a section of the Act expressly establishes or authorizes[48] a prior approval requirement.[49]
 
 
 48
 Applying these principles to the instant case, the issues to be resolved are two: whether and to what extent Section 214 of the Communications Act expressly authorizes the Commission to impose prior approval requirements through the facilities authorization mechanism, and whether the Commission has properly exercised whatever authority it may have under Section 214.
 
 
 49
 Section 214 establishes the Commission's regulatory charter over entry into the common carrier communications field and states that no carrier shall construct, extend, or acquire a line unless the Commission has first affirmatively determined that such entry would be in the public interest.[50] The primary purpose of Section 214(a) is prevention of unnecessary duplication of facilities, not regulation of services.[51] Because of this, Section 214 would appear to have a limited office with respect to regulation of service offerings on existing lines. We have held as much,[52] and this view is confirmed by the final proviso to Section 214(a) which states expressly that
 
 
 50
 nothing in this section (214) shall be construed to require a certificate or other authorization from the Commission for any * * * changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.[53]
 
 
 51
 Moreover, we do not agree with the suggestion of Commission counsel in brief[54] that Judge Wilkey's opinion in Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 498 F.2d 771 (1974), somehow transmogrifies Section 214(a) so that carriers must now obtain Commission approval before they implement new services.[55] In Hawaiian Telephone this court reversed a grant of Section 214 authority to RCA Global Communications, Inc. on the ground that the Commission was allowing competition merely for competition's sake in direct violation of the teaching of the Supreme Court in FCC v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). In stating the proper standard to be applied under Section 214(a) Judge Wilkey wrote: "When the FCC considers an application for certification of a new line, it must start from the situation as it then exists, and must * * * determine whether indeed the public convenience and necessity requires more or better service." 498 F.2d at 776 (emphasis added). We do not read this statement to suggest that every time a carrier seeks to start a new service over existing facilities it must petition the Commission under Section 214(a), but rather it is merely a matter of fact observation that it is analytically impossible to determine the need for a new facility without considering the services to be provided over it. In addition, the reading suggested by the Commission would nullify the final proviso of Section 214(a) by requiring a "certificate (and) other authorization from the Commission" prior to changes in carriers' operations even if such changes did not affect the "adequacy or quality" of the carriers' preexisting services. There is no indication that the Hawaiian Telephone court contemplated such a remarkable result. Nor, indeed, can such a result be justified by reference to the primary purpose of Section 214 because, so long as the "adequacy or quality" of the service proposed in a Section 214(a) application is not impaired by provision of other services, the public need that justified construction of facilities will still be met and there is no sense in which those facilities would have become needlessly duplicative.
 
 
 52
 Notwithstanding the proviso to Section 214(a), Section 214(c) gives the Commission authority to[56]issue such certificate (facility authorization) as applied for * * * or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. * * *
 
 
 53
 (Emphasis added.) Used to condition the services an individual carrier may offer, Section 214(c) would provide a power over individual carriers in all respects identical to its power over classes of carriers under Section 303(b), which was held in Press Wireless, Inc. v. FCC, supra, to give the Commission authority to create a prior approval requirement. For this reason Section 214(c) does, in our judgment, authorize the Commission to restrict the services that may be offered over a communication line once it is built, acquired, or extended. Cf. Western Union Telegraph Co. v. FCC, 541 F.2d 346, 355 (3d Cir. 1976). However, since any prior approval requirement is in derogation of the legislative compromise embodied in Sections 203-205, the Commission must strictly follow the terms of Section 214(c) and it cannot impose any such restriction unless it has affirmatively determined that "the public convenience and necessity (so) require."
 
 C.
 
 54
 With the framework of our inquiry in mind, we turn next to the question whether the Commission was correct in concluding that the Specialized Common Carrier decision was a lawful exercise of Section 214(c) authority. As we understand the Commission's opinion on remand, there are two considerations supporting its view that the Specialized Common Carrier decision restricted the services specialized carriers can offer first, the fact that only private line services were before the Commission in Section 214 applications[57] and, second, that the Commission's analysis of cream-skimming assumed that specialized carriers would be restricted to private line services.[58] We consider these in turn.[59]
 
 
 55
 We can assume, without deciding, that a service like Execunet was not within the contemplation of the Commission when it made the Specialized Carrier decision. Nonetheless, it is readily apparent that failure to consider the public interest ramifications of a service either pro or con during resolution of a Section 214(a) application is simply not the same thing as an affirmative determination that the "public convenience and necessity may require"[60] a restriction on a facility authorization limiting a carrier to provision solely of those services proposed in its Section 214(a) application.
 
 
 56
 The Commission's analysis of cream-skimming in the Specialized Common Carrier decision similarly gives no evidence that the Commission made an affirmative finding that revenue diversion would be a problem if specialized carriers were allowed to compete on the fringes of the message telephone service market as MCI allegedly proposes to do. No such issue was before the Commission in that proceeding. As it has repeatedly asserted here, all it had to consider was whether the competition proposed in the Section 214 applications before it raised serious revenue diversion problems threatening the public interest. This is all it apparently did decide:
 
 
 57
 (W)e do not see how there could be any diversion of revenues of a magnitude to have the impact claimed by AT&T, in view of the very small percentage of AT& T's existing total market that is vulnerable to competition of the kind proposed here, the growth rate of Bell's basic services, and the likelihood that AT&T would obtain a very substantial share of the potential market for specialized services.[61]
 
 
 58
 Moreover, the Commission's staff report, which formed the basis for the Specialized Carrier decision, ruminated more broadly on the issues posed by revenue diversion and it appeared highly skeptical of the validity of AT&T's overall argument.[62] Thus there is simply nothing in Specialized Carriers that would support a conclusion that revenue diversion required restrictions on MCI's facility authorizations.[63]
 
 
 59
 Finally, it should also be noted that the Commission staff, in its report adopted by the Commission,[64] dealt explicitly with the question of how the Commission ought to deal with possible adverse impacts of service offerings other than those which were before the Commission in the Specialized Common Carrier decision:
 
 
 60
 In the event that adverse consequences to the public should develop, the Commission can take such action on the relevant tariff filings as may be necessary to protect the public. We think that in the context of the matters now before the Commission involving proposed new and different services, a question of this nature is more appropriately considered in connection with the tariffs rather than upon authorization of the facilities.[65]
 
 And, again, the staff wrote:
 
 61
 The results of any authorizations would be the object of close and continuous scrutiny by the Commission. Should adverse consequences develop or appear imminent, the Commission can take such remedial action or precautionary measures as may be necessary to protect the public. As indicated, appropriate action can be taken in connection with the tariffs. In addition, any renewal of license for the proposed facilities would require a public interest finding and could be subject to any needed conditions. Moreover, the Commission's broad rule making powers are always available. * * *[66]
 
 
 62
 The undeniable import of the staff's analysis is that questions related to the future impact of specialized carrier service offerings other than those immediately at hand in the Specialized Common Carrier case should be resolved in other proceedings in tariff proceedings, upon license renewal, or by further rulemaking. Strikingly absent from this list is a mention of further Section 214 proceedings.
 
 
 63
 For the reasons stated above the Commission's Specialized Common Carrier decision cannot reasonably be read to have made an affirmative determination that the public convenience and necessity required "private line" restrictions on the facilities authorizations of specialized common carriers.[67] Instead, it appears that the Commission saw benefits accruing to the public from the services which were before it. In granting the facilities authorizations on the basis of that public interest finding, the Commission did not perhaps intend to open the field of common carrier communications generally, but its constant stress on the fact that specialized carriers would provide new, innovative, and hitherto unheard-of communications services clearly indicates that it had no very clear idea of precisely how far or to what services the field should be opened.[68] As indicated in the staff report, a decision was apparently made to consider the consequences of future developments in appropriate future proceedings. There being no affirmative determination of public interest need for restrictions, MCI's facility authorizations are not restricted and therefore its tariff applications could not properly be rejected.
 
 D.
 
 64
 As a final and somewhat collateral point, we are concerned with a thread running through the Commission's analysis that the Specialized Carrier decision granted AT&T a de jure monopoly over MTS and WATS service which would be undermined were MCI allowed to provide Execunet because any such assertion is plainly incorrect and may have influenced the Commission's disposition of the instant case.
 
 
 65
 As the Commission staff explained in Specialized Carriers, absence of competition in the "general domestic common carrier service field * * * is due primarily to the fact that until the filing of (MCI's first Section 214 applications) the Commission had no occasion to consider applications for competitive service in this area."[69] The question whether AT&T should be granted a de jure monopoly was not among those proposed to be decided in Specialized Carriers, and nowhere in that decision can justification be found for continuing or propagating a monopoly that, according to the staff, had theretofore just grown like Topsy. Of course, there may be very good reasons for according AT&T de jure freedom from competition in certain fields; however, one such reason is not simply that AT&T got there first. Indeed, the Commission's attempt here to imbue AT&T's existence with public interest significance represents a retrenchment from the position it took in passing on a proposal to enter the MTS field via domestic communications satellites: "(W) e should not reject any proposal that might prove feasible and beneficial to the public simply because it represents some departure from the established scheme." Domestic Communications-Satellite Facilities, 35 FCC2d 844, 854 (1972).
 
 
 66
 Because the Commission has not so far determined that the public interest would be served by creating an AT&T monopoly in the interstate MTS field, it may not properly draw any inferences about the public interest from the bare fact that another carrier's proposed services would compete in that field.
 
 III. CONCLUSION
 
 67
 We have today decided that the Commission erred in rejecting MCI's Execunet tariff as unauthorized. The Commission has no general authority to insist that carriers receive its approval before filing tariffs proposing new services or rates. Only if the Commission has determined that the public convenience and necessity may require that new services receive advance approval can it then reject a tariff as unauthorized. In so holding we have not had to consider, and have not considered, whether competition like that posed by Execunet is in the public interest. That will be the question for the Commission to decide should it elect to continue these proceedings. In that eventuality the Commission must be ever mindful that, just as it is not free to create competition for competition's sake,[70] it is not free to propagate monopoly for monopoly's sake. The ultimate test of industry structure in the communications common carrier field must be the public interest, not the private financial interests of those who have until now enjoyed the fruits of de facto monopoly.[71]
 
 
 68
 Reversed and remanded.
 
 
 
 [1]
 The orders are a letter order of July 2, 1975 (FCC 75-799) and the Decision in MCI Telecommunications Corp., 60 FCC2d 25 (July 13, 1976). The letter order is set out at Appendix B of the second order, 60 FCC2d at 62-64
 
 
 [2]
 Apparently the tariffs do not themselves define Execunet service, but define only certain "modular" services and rates therefor. Putting these modular services together in a particular way results in the Execunet service package. The term "metered use" refers to the fact that charges for some services are set on a usage basis
 
 
 [3]
 Execunet's characteristics are summarized as follows
 A customer in the calling city calls the local MCI office via local exchange telephone service from any push-button telephone in the local exchange area. A rotary-dial telephone can also be used if the caller has a touch-tone pad (tone generator). This device can be purchased in the open market from numerous sources. He then pulses his customer code and the area code and calling number of any telephone in one of a number of distant cities. Connection at the distant end may again be accomplished via the local exchange telephone service in that area. Upon connection, the customer is charged a per-minute toll, based upon the mileage to the city called, subject to a connection charge and a monthly minimum charge. Any MCI Execunet customer in the calling city can access the system at any time to place a call, and presumably many such customers may utilize the intercity facilities simultaneously. In other words, none of the MCI plant, or indeed any of the plant used in completing the call, is dedicated to the use of a particular customer during any specified time; rather it is available upon demand.
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 26 n.1.
 
 
 [4]
 Letter from FCC to MCI, May 1, 1975, MCI Telecommunications Corp., supra note 1, Appendix B, 60 FCC2d at 64, JA 8
 
 
 [5]
 Letter from MCI to FCC, June 5, 1975, MCI Telecommunications Corp., supra note 1, Appendix B, 60 FCC2d at 65-68, JA 9-15
 
 
 [6]
 Letter from MCI to FCC, June 9, 1975, MCI Telecommunications Corp., supra note 1, Appendix B, 60 FCC2d at 69-70, JA 16-18
 
 
 [7]
 § 21.705 Permissible communications
 Stations in this service are authorized to render any kind of communication service provided for in the legally applicable tariffs of the carrier, unless otherwise directed in the applicable instrument of authorization or limited by § 21.701 or § 21.703 (the latter rules relating to frequency use). * * *
 
 
 [47]
 C.F.R. § 21.705 (1976)
 
 
 [8]
 Letter from MCI to FCC, July 1, 1975, MCI Telecommunications Corp., supra note 1, Appendix B, 60 FCC2d at 80-84, JA 39-48
 
 
 [9]
 In the Matter of Establishment of Rules Pertaining to the Authorization of New or Revised Classifications of Communications on Interstate or Foreign Common Carrier Facilities, and Amendment of Part 63.60-63.90 of the Rules, Notice of Proposed Rule Making, 27 FCC2d 36 (1971); Report and Order, 39 FCC2d 131 (1973)
 
 
 [10]
 See Letter, supra note 8, 60 FCC2d at 82-83, JA 44-46
 
 
 [11]
 "(T)he termination of the rule making proposed herein will make it possible for domestic carriers, as a general rule, to offer new classes or subclasses of communications service over duly authorized facilities merely by the filing of appropriate tariff revisions * * *." Report and Order, supra note 9, 39 FCC2d at 135
 
 
 [12]
 MCI Telecommunications Corp., supra note 1, Appendix B, 60 FCC2d at 64
 
 
 [13]
 Id. at 63
 
 
 [14]
 Id
 
 
 [15]
 5 U.S.C. § 553 (1970)
 
 
 [16]
 47 C.F.R. §§ 1.711-1.735 (1976)
 
 
 [17]
 47 C.F.R. §§ 1.1201-1.1251 (1976). See also Rules Governing Ex Parte Communications, 1 FCC2d 49 (1965)
 
 
 [18]
 This court initially stayed the Commission's order in its entirety. After the proceedings on remand our order was modified to allow MCI to continue to serve its present customers, but solicitation of new customers was not permitted
 
 
 [19]
 "SA" refers to a two-volume Supplemental Appendix covering the proceedings on remand
 
 
 [20]
 MCI Telecommunications Corp., 57 FCC2d 271, 271-272 (1975), SA 49-50
 
 
 [21]
 MCI Telecommunications Corp., --- FCC2d --- (FCC 76-442, May 17, 1976), SA 894
 
 
 [22]
 Id., SA 895
 
 
 [23]
 Id
 
 
 [24]
 (a) No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line * * *. * * * No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby * * *. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: Provided, however, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided
 
 
 [25]
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 35
 
 
 [26]
 Specialized Common Carrier Services, 29 FCC2d 870 (1971), aff'd, sub nom. Washington Utilities & Transportation Comm'n v. FCC, 513 F.2d 1142 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). See also Bell Telephone Co. v. FCC, 503 F.2d 1250 (3d Cir. 1974), cert. denied, 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); AT&T v. FCC (United States Transmissions Systems, Inc.), 176 U.S.App.D.C. 288, 539 F.2d 767 (1976)
 
 
 [27]
 Specialized Common Carrier Services, supra note 26, 29 FCC2d at 878
 
 
 [28]
 See note 68 infra
 
 
 [29]
 35. At the time of the Specialized Common Carrier decision, we had before us 1712 microwave applications from 33 applicants, 17 of which were affiliated with MCI. Accordingly, the statements of MCI as to the types of services it proposed to offer were of importance in the policy determination made therein and are helpful in ascertaining the limits, if any, imposed upon Specialized Common Carrier (SCC) service offerings. The MCI applications considered were for "portions of a proposed nationwide network to provide specialized private line communications services" (emphasis added) 29 FCC2d at 874. We further quoted MCI's pleadings that "the real distinction which delineates MCI service from anything provided today by existing common carriers is not the facility itself but the manner in which a customer may utilize it in order to provide a customized intra-company point-to-point communications system of his own design and capability" 29 FCC2d at 875. Finally MCI asserted that there was a distinct difference between a public telephone service which is a natural monopoly and a customized communications service offered on a private line basis, Id. (sic ) Thus, MCI sought therein to offer only private line, point-to-point services. * * *
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 36. See also FCC Letter Order, id., Appendix B, 60 FCC2d at 62:
 Specialized Common Carrier Services, 29 F.C.C.2d 870 (1971), which established the Commission's policies regarding entry of the specialized common carriers in competition with AT&T, contemplated such entry only in the private line field, not in the area of switched public message telecommunications service. * * *
 
 
 [30]
 See Specialized Common Carrier Services, supra note 26, 29 FCC2d at 910 (P 78)
 
 
 [31]
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 36, quoting Specialized Common Carrier Services, supra note 26, 29 FCC2d at 915
 
 
 [32]
 Id. at 38
 
 
 [33]
 See Notice of Proposed Rule Making, supra note 9, 27 FCC2d at 38-39
 
 
 [34]
 Id. at 39
 
 
 [35]
 See Report and Order, supra note 9, 39 FCC2d at 137
 
 
 [36]
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 39
 
 
 [37]
 See id. at 40-44
 
 
 [38]
 Id. at 44-48
 
 
 [39]
 (W)e disagree with MCI that we have never defined the areas of telecommunications service which should be open to competition and those which are a monopoly. Rather, that was the principal purpose of our investigation in (Specialized Carrier Services, supra note 26). * * *
 
 
 [109]
 In essence MCI is * * * asking us to reopen the Specialized Common Carrier decision to determine again what services should be open to competition. We decline to do so. * * * There is no allegation that the public interest considerations upon which the Specialized Common Carrier (was) based have changed at all * * *
 MCI Transcommunications Corp., supra note 1, 60 FCC2d at 56-57.
 
 
 [40]
 Id. at 48-54
 
 
 [41]
 See text at note 13 supra ; note 24 supra
 
 
 [42]
 See Notice of Proposed Rule Making, supra note 9, 27 FCC2d at 38; Report and Order, supra note 9, 39 FCC2d at 133
 
 
 [43]
 See also North Central Truck Lines, Inc. v. ICC, 559 F.2d 802, 804 (D.C. Cir. decided June 6, 1977); Delta Air Lines, Inc. v. CAB, 177 U.S.App.D.C. 100, 543 F.2d 247, 254 (1976); Municipal Light Boards of Reading & Wakefield, Mass. v. FPC, 146 U.S.App.D.C. 294, 450 F.2d 1341, 1345-1346 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972)
 MCI has vigorously argued that rejection of a tariff is not possible once a tariff has become effective. We need not decide whether this is so since, as this case comes to us after remand, no facts material to the issues thus far decided by the Commission are in dispute and, accordingly, the Commission could, as it apparently did, issue a cease and desist order pursuant to 47 U.S.C. § 205 (1970) without more of a hearing than has already been afforded MCI. Thus, even if the Commission was without power to reject a tariff as that phrase is used as a term of art, it was empowered to reject the Execunet tariff in a practical sense.
 
 
 [44]
 Under the Communications Act the practices of existing carriers using existing facilities are regulated primarily through the tariff mechanism established in §§ 203-205 of the Act, 47 U.S.C. §§ 203-205 (1970). Section 203 obliges carriers to file tariff schedules with the Commission and to make such schedules available to the public. Section 203(b) expressly recognizes that changes in the services a carrier may offer will be commenced with a tariff filing. Operation except in strict compliance with applicable tariffs is prohibited, 47 U.S.C. § 203(c), as are discriminations and preferences, id. § 202. Prior to the effective date of a tariff a date certain that must be set out in the tariff, id. § 203(d) the Commission may suspend the tariff and hold a hearing concerning the lawfulness thereof. Id. § 204. If the hearing has not been completed within three months (five months as of 1976, see 47 U.S.C.A. § 204 (1977 pocket part)) after the effective date of the suspended tariff, that tariff by law goes into effect. Id. After the effective date, and without regard to whether a tariff has previously been suspended, the Commission may hold a hearing on the lawfulness of the tariff, although the tariff must be allowed to remain in effect pending the outcome of such a hearing. Id. § 205; see AT&T v. FCC, 487 F.2d 865, 874-875 (2d Cir. 1973). Subsequent to a hearing under either § 204 or § 205 the Commission may prescribe such rates, classifications, regulations, or practices as shall be determined to be just, fair, and reasonable, and it may enjoin the carrier from continuing services except as prescribed. 47 U.S.C. §§ 204, 205
 
 
 [45]
 "Section 204 * * * is adapted from section 15(7) of the Interstate Commerce Act so as to apply to communications. * * * Section 205 follows sections 15(1) and 16(8) of the Interstate Commerce Act * * *." S.Rep.No.781, 73d Cong., 2d Sess. 4 (1934). See also H.R.Rep.No.1850, 73d Cong., 2d Sess. 5-6 (1934)
 
 
 [46]
 Since the most likely objection to MCI's provision of Execunet service is its potential effect on AT&T's MTS, it is useful to note that the Supreme Court, in Arrow Transportation Co. v. Southern R. Co., 372 U.S. 658, 669, 83 S.Ct. 984, 990, 10 L.Ed.2d 52 (1963), rejected the claim that a court should have the power to extend the statutory suspension period to protect competitors of a carrier and their customers:
 It must be admitted that Congress dealt with the problem as it affected the relations between shippers and carriers, making no express reference to the interests of competing carriers and their customers such as are involved in this case. We see no warrant in that omission, however, for a difference in result. * * *
 In noting that neither claims of a carrier's customers nor those of its competitors or competitors' customers in any way abridge the right of a carrier to implement a new rate or service, we do not intend to suggest that a showing of harm to competitors or competitors' customers would be insufficient to sustain a service restriction promulgated in accord with 47 U.S.C. § 214(c) (1970) or 47 U.S.C. § 303(b) (1970). Our only point is that allegations of harm to competitors or competitors' customers do not in any way expand the Commission's suspension or rejection powers.
 
 
 [47]
 AT&T v. FCC, supra note 44, 487 F.2d at 880 (footnote omitted)
 
 
 [48]
 Of course, if the statute merely authorizes the Commission to impose a prior approval requirement, as is the case with § 303(b), 47 U.S.C. § 303(b) (1970), that authority would have to be exercised before rejection is proper
 
 
 [49]
 AT&T v. FCC, supra note 44, 487 F.2d at 876-881 & 880 n.13, citing Associated Press v. FCC, 145 U.S.App.D.C. 172, 448 F.2d 1095, 1103 (1971)
 
 
 [50]
 See note 24 supra
 
 
 [51]
 See 78 Cong.Rec. 10314 (1934) ("The section (§ 214) is designed to prevent useless duplication of facilities, with consequent higher charges upon the users of services."). It is also clear that § 214 was intended to apply only to construction or acquisition of new lines. See id.; H.R.Rep.No.1850, supra note 45, at 6; S.Rep.No.781, supra note 45, at 5; accord, Western Union Telegraph Co. v. FCC, 541 F.2d 346, 355 (3d Cir. 1976); United Telegraph Workers v. FCC, 141 U.S.App.D.C. 190, 436 F.2d 920 (1970)
 Of course, § 214 also applies to abandonment of service, see note 24 supra, but no one has so far contended that Execunet will have any impact, adverse or otherwise, on provision of pre-existing MCI services.
 
 
 [52]
 In the first Western Union Mailgram case, United Telegraph Workers v. FCC, supra note 51, the Telegraph Workers sought to force the FCC to enjoin Mailgram service pending a hearing at which § 214 issues could be ventilated. The Commission, on the other hand, maintained that the Mailgram tariff should be processed in the same manner as any other tariff filing. This court sided with the Commission on the ground that (with exceptions not relevant here) § 214 did not apply to even this novel use of existing facilities. See 436 F.2d at 924-925
 
 
 [53]
 47 U.S.C. § 214(a) (1970) (emphasis added); see note 24 supra
 
 
 [54]
 FCC brief at 24 & n.14, 32 n.23
 
 
 [55]
 If this were the case, then there would obviously have been no need for the rulemaking in Docket 19117 which proposed rules that would have required "common carriers (to) request prior Commission approval before offering or discontinuing any new or revised classification of communications, irrespective of whether offered over proposed new facilities or over facilities previously authorized by the Vommission (sic )." Notice of Proposed Rule Making, supra note 9, 27 FCC2d at 38-39. Similarly, if the Commission is now correct, then both the Commission and this court were in error in United Telegraph Workers v. FCC, supra note 51. See note 52 supra. See also MCI Telecommunications Corp., supra note 1, 60 FCC2d at 38 ("a carrier need not generally file an application (under § 214) for each new service it wishes to implement")
 
 
 [56]
 Section 214(c) provides:
 The Commission shall have power to issue such certificate as applied for, or to refuse to issue it, or to issue it for a portion or portions of a line, or extension thereof, or discontinuance, reduction, or impairment of service, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. After issuance of such certificate, and not before, the carrier may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, extension, acquisition, operation, or discontinuance, reduction, or impairment of service covered thereby. Any construction, extension, acquisition, operation, discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest.
 47 U.S.C. § 214(c) (1970).
 
 
 [57]
 See note 29 supra
 
 
 [58]
 (O)ur analysis of possible revenue diversion (29 FCC2d at 911-914) dealt only with the private line revenues of these two carriers. Further, we recognized that SCCs would not compete directly with the established carriers' message services
 "There is no reason to believe that (nationwide average) pricing of the interstate message service offerings of the Bell System and Western Union (such as MTT, WATS, and public telegraph) need be altered by new entry into the developing specialized communications market. Clearly, none of the uniform rate structures of the existing carriers for such services would appear in jeopardy since those services are not being challenged competitively to any substantial degree by the services proposed to be offered by the aspiring new entrants." 29 FCC2d at 915 (emphasis added)(.)
 MCI Telecommunications Corp., supra note 1, 60 FCC2d at 36.
 
 
 [59]
 The Commission offered two other considerations in support of its interpretation of Specialized Common Carrier Services, supra note 26. First, it concluded that specialized carriers would not duplicate services already being offered, whereas in the Commission's view Execunet would duplicate MTS. We fail to see the relevance of this assertion in light of AT&T v. FCC, supra note 26
 The Commission also pointed to statements made by the Ninth and Third Circuits in, respectively, Washington Utilities & Transportation Comm'n v. FCC, supra note 26, and Bell Telephone Co. v. FCC, supra note 26. In Washington Utilities, however, the scope of the services authorized in Specialized Carriers was not at issue; the reference is simply a general description of the services proposed in the applications before the Commission. The Bell Telephone case involved a very different issue, namely, whether the Commission had affirmatively determined that it would be in the public interest to require AT&T to interconnect with MCI for the purpose of allowing MCI to offer FX and CCSA service. See 47 U.S.C. § 201(a) (1970). The Commission's view was that Specialized Carriers had settled the point, whereas AT&T argued that, since MCI had never mentioned FX and CCSA services in its § 214(a) applications, MCI's provision of those services had not been approved even if some other carriers' might have been. The Third Circuit held that the Commission in Specialized Carriers had made an affirmative determination that interconnection for provision of private line services was a general matter in the public interest and that MCI was covered by this general determination. Bell Telephone therefore stands for the proposition that the Commission in Specialized Carriers decided at least that specialized carriers could provide all private line services. However, one cannot reason from this proposition to its converse that specialized carriers may offer only private line services yet the converse is the issue relevant under § 214(c) as we explain in text.
 
 
 [60]
 47 U.S.C. § 214(c) (1970)
 
 
 [61]
 Specialized Common Carrier Services, supra note 26, 29 FCC2d at 910
 
 
 [62]
 See id. at 883-884
 
 
 [63]
 It should also be noted that subsequent to Specialized Carriers the Commission has indicated a willingness to consider competition in the message telephone field on its merits. See Domestic Communications-Satellite Facilities, 35 FCC2d 844, 853-854 (1972). To a large extent this undercuts the Commission's argument here, see note 39 supra, that it conferred a statutory monopoly on AT&T in this field
 
 
 [64]
 See Specialized Common Carrier Services, supra note 26, 29 FCC2d at 920 (P 103) ("In light of all of the foregoing and the record as a whole, we adopt our staff's analysis * * * as amplified and modified herein."). There is no indication that the Commission "modified" the staff's analysis of the points relevant to this appeal
 
 
 [65]
 Specialized Common Carrier Services, supra note 26, 29 FCC2d at 886 (emphasis added)
 
 
 [66]
 Id. at 887 (emphasis added)
 
 
 [67]
 For this reason the deference normally owed to our agency's interpretation of its own decisions, see, e. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), is not appropriate here. See id. at 18, 85 S.Ct. 792
 
 
 [68]
 See Specialized Common Carrier Services, supra note 26, 29 FCC2d at 905-914 (PP 65-86). Indeed, to the extent that any definition of a specialized common carrier emerges from the Commission's discussion, that definition appears to be simply that a specialized carrier is any carrier that does not attempt to optimize its service offerings to the voice communications needs of the general public. See id. at 882 (P 29); id. at 906-907 (PP 69-70)
 
 
 [69]
 Id. at 881
 
 
 [70]
 See FCC v. RCA Communications, Inc., 346 U.S. 86, 96-97, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); Hawaiian Telephone Co. v. FCC, 162 U.S.App.D.C. 229, 498 F.2d 771, 776-777 (1974)
 
 
 [71]
 Cf., e. g., Carroll Broadcasting Co. v. FCC, 103 U.S.App.D.C. 346, 258 F.2d 440, 443 (1958)